*1* FILED
2023 May-26  AM 08:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | * |
| | 2:23-mj-224-SGC |
| | * |
| vs. | May 19, 2023 |
| | * 2:30 p.m. |
| JUAN ANTONIO DURAN, | |
| | * Birmingham, Alabama |
| Defendant. | |
| | * |

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

**TRANSCRIPT OF HEARING**
**BEFORE THE HONORABLE STACI G. CORNELIUS**
**UNITED STATES MAGISTRATE JUDGE**

* * * * * * * * * * * * * * * * * * * * * * * *  * * * * *

For the USA:          Daniel McBrayer
                      U.S. Attorney's Office


For the Defendant:    Katherine Pritchett Bounds
                      Federal Public Defender


Court Reporter:       Leah S. Turner, RMR, CRR
                      Federal Official Court Reporter

1        This cause came to be heard and was heard on the
19th day of May 2023, before the Honorable Staci G. Cornelius,
2   United States District Judge, holding court for United States
District Court, Northern District of Alabama, Southern
3   Division, in Birmingham, Alabama.

4        Proceedings continued as follows:

5        P R O C E E D I N G S

6        (COURT CALLED TO ORDER.)

7        THE COURT:  We are on the record in the matter of

8   United States of America versus Juan Antonio Duran,

9   2:23-mj-224.  Mr. Duran is present in court with his counsel,

10  Ms. Kate Bounds with the office of the Federal Public

11  Defender.  Government is present and represented by assistant

12  U.S. attorney Daniel McBrayer.

13       I will note that since the initial appearance, the

14  United States probation office has prepared for the Court and

15  counsel a pretrial services report, which I have reviewed and

16  I assume counsel has done the same unless you say otherwise.

17       I will also note that at the initial appearance,

18  there was an official court interpreter that was utilized to

19  assist Mr. Duran as well as cocounsel, Mr. Flores.  I have

20  been told that Mr. Duran elected to proceed with this hearing

21  without the assistance of an interpreter, but I just want to

22  cover that with you, Mr. Duran, on the record.  Do you

23  understand that we are not using an official interpreter for

24  this proceeding?

25       THE DEFENDANT:  Yes, ma'am.

1      THE COURT:  And is that how you want to proceed?

2      THE DEFENDANT:  Yes, Your Honor.

3      THE COURT:  All right.  You understand the English

4  language sufficiently that you are ready to go forward?

5      THE DEFENDANT:  Yes, ma'am.

6      THE COURT:  Great.  Mr. McBrayer?

7      MR. McBRAYER:  Yes, Your Honor?

8      THE COURT:  You may proceed.

9      MR. McBRAYER:  Thank you, Your Honor.  Government

10  calls special agent Chris Baker.

11                    **CHRIS BAKER,**

12  called as a witness by the government, after having been sworn

13  to speak the truth, testified as follows:

14                  **DIRECT EXAMINATION**

15  **BY MR. McBRAYER:**

16  **Q**      Mr. Baker, what do you do for a living?

17  **A**      I'm a special agent for the Bureau of Alcohol, Tobacco,

18  Firearms & Explosives assigned to the Birmingham field office,

19  group one.

20  **Q**      How long have you been with ATF?

21  **A**      Since January 2016.

22  **Q**      What are your basic duties there?

23  **A**      Reduction of violent crime, firearms investigations,

24  arson investigations, explosive investigations, and occasional

25  drugs.

1   **Q**    Do you have previous law enforcement experience?

2   **A**    I do.

3   **Q**    With whom?

4   **A**    Birmingham city police department for nearly eight

5   years.

6   **Q**    Did your agency, specifically Birmingham ATF, have an

7   investigation involving Juan Antonio Duran?

8   **A**    Yes.

9   **Q**    Are you familiar with Birmingham Pistol Wholesale?

10   **A**    I am.

11   **Q**    Is it incorporated under the name Gun Prime, LLC?

12   **A**    It is.

13   **Q**    Is it a federally licensed firearms dealer?

14   **A**    Better known as an FFL, yes.

15   **Q**    Can you describe for the Court the gun sale process.

16   How does that work?

17   **A**    A customer would walk into the retail area of the

18   store, select whatever firearm they wish to purchase from the

19   licensee or the FFL, and complete an ATF form 4473 prior to

20   that transfer taking place.

21   **Q**    And that 4473 that you mentioned, that form, is that

22   legally required?

23   **A**    It is.

24   **Q**    Tell me and tell the Court about question 21(a).  What

25   does it ask?

1    **A**      Question 21(a), if I recall correctly, deals with are

2    you the actual buyer or purchaser of the firearms listed on

3    the form, which would be the ones you have selected for

4    purchase, and then it also provides instructions that if you

5    don't understand or wish to have more information about that

6    question, that you can turn to another page to receive those

7    instructions.

8    **Q**      Is there any sort of background check that takes place

9    after this?

10   **A**      Yes.  It's the responsibility of the licensee to call

11   the National Instant Background Checks system, which is the

12   NICS branch of the FBI, is who manages that, and the FBI

13   actually conducts that background check prior to the transfer.

14   **Q**      How long does that take?

15   **A**      It could take anywhere from a couple of minutes to a

16   couple of days to -- I have even seen some weeks or months

17   later.

18   **Q**      Let me turn you back to question 21(a).  What is the

19   import of that?  What is it trying to get at?

20   **A**      It's to combat straw purchasing.  That is one person

21   providing funds for another, basically a nominee to do the

22   paperwork to which you are providing those funds and actually

23   conducting that business and that transaction.

24            What I think the intent is to have people that are

25   actually possessing the firearms and using the firearms be the

1   ones that actually get the background check conducted on.

2   **Q**      Are you familiar with a Barrett 50 caliber rifle?

3   **A**      I am.

4   **Q**      About how much do they typically cost?

5   **A**      It depends on where you go.  I would say 9500 to

6   fourteen, fifteen thousand dollars.

7   **Q**      And what is the use of a Barrett 50 caliber rifle?

8   **A**      Primarily used by militaries around the world and it's

9   for extremely long-range sniper applications, like in the area

10  of half a mile to a mile, and then antimaterial.

11  **Q**      What is antimaterial?

12  **A**      Antimaterial would be like antivehicular,

13  antiwatercraft, antiaircraft, antiarmor, punching through

14  brick walls, things like that.

15  **Q**      Let me turn your attention to December of last year.

16  Did Mr. Duran come to the attention of ATF Birmingham in

17  December of last year?

18  **A**      Yes, he did.

19  **Q**      How so?

20  **A**      We received information from one of our federal local

21  firearms licensees that Duran had called them and attempted

22  what they call an FFL to FFL interstate transfer of two

23  Barrett 50 caliber rifles.

24  **Q**      What would the total purchase price be for that

25  purchase?

1    **A**      Around $20,000.

2    **Q**      Did that purchase go through?

3    **A**      It did not.  I believe the local FFL, when they found

4    out they were shipping to an address in Oklahoma and that

5    Mr. Duran had provided a North Dakota identification, and

6    that's a violation of state law, because -- violation of

7    federal law because he wasn't providing identification for the

8    state in which he resided and he wasn't picking up the

9    firearms from the state in which he resided.

10   **Q**      Let me speed you forward to May 5th of this year.  Is

11   High End Armament Technology, Incorporated, an FFL?

12   **A**      It is.

13   **Q**      Where is it located?

14   **A**      Tulsa, Oklahoma.

15   **Q**      Did the defendant go there on May 5th of this year?

16   **A**      Yes.

17   **Q**      Did anybody go with him?

18   **A**      Mr. Flores, the codefendant.

19   **Q**      Did they arrive together?

20   **A**      They did.

21   **Q**      What kind of car were they in?

22   **A**      I believe -- this was on the 5th, correct?

23   **Q**      Yes.

24   **A**      They were in the black Nissan Titan.

25   **Q**      To whom is that registered?

1   **A**      Mr. Duran.

2   **Q**      Did they make any sort of attempt to purchase while

3   they were at High End?

4   **A**      While Mr. Duran and Flores were at High End Armaments

5   in Tulsa, Oklahoma, Mr. Flores selected a Barrett 50 caliber

6   rifle for purchase and filled out an ATF form, or started

7   filling it out at least.

8   **Q**      Did the purchase go through?  Did the transfer

9   complete?

10  **A**      It did not.  I believe ultimately Mr. Flores presented

11  a United States passport for identification for that purchase,

12  and the gun store, the FFL, denied that based on federal law.

13  **Q**      Does federal law require something more than a United

14  States passport?

15  **A**      Yes.  Your identification needs to represent -- or has

16  to be associated with the state, like we've got to know what

17  state you're from.

18  **Q**      It needs to have the person's residential address?

19  **A**      That's on the form as well, yes.

20  **Q**      So that was May 5th.  Was May 5th a Friday?

21  **A**      I would have to look at my calendar, I believe so.  Do

22  you want me to look?

23  **Q**      No, that's okay.  What happened on May 8th?

24  **A**      May 8th is the day Mr. Flores, the codefendant, entered

25  the Oklahoma Department of Motor Vehicles and obtained a

```
1    temporary identification card.
2    Q      And that was Mr. Flores?
3    A      That's correct.
4    Q      What did Mr. Flores do after he got that temporary
5    identification?
6    A      Called the Oklahoma FFL and indicated that he had
7    obtained a state ID and that he was ready to purchase a
8    Barrett 50 caliber rifle.
9    Q      He called High End Armament Technology in Tulsa?
10   A      Yes.
11   Q      And attempted to complete that transfer or purchase of
12   a Barrett 50 caliber rifle?
13   A      Yes.
14   Q      Was he able to do that?
15   A      He was not.
16   Q      Why not?
17   A      The gun store employee that I spoke to indicated that
18   their suspicion was at a heightened level, that they felt like
19   it wasn't right.  So they actually indicated to Mr. Flores
20   and/or Mr. Duran at that time that the business was closed on
21   Monday.
22   Q      What did Mr. Flores and Duran do after they learned
23   High End was closed that day?
24   A      They drove to Birmingham, Alabama.
25   Q      Approximately what time did they arrive in Birmingham?
```

1    **A**    I can prove that Duran's vehicle was in the city limits

2    of Birmingham just after 7 p.m.

3    **Q**    When you say Duran's vehicle, what vehicle are you

4    talking about?

5    **A**    The 2016 black Nissan Titan.

6    **Q**    And about how long of a drive is it from Tulsa to

7    Birmingham?

8    **A**    About nine hours.

9    **Q**    Did they go to Birmingham Pistol Wholesale?

10   **A**    The following morning, about -- what day are we on, the

11   9th?

12   **Q**    The next day would have been the 9th.

13   **A**    They went to Birmingham Pistol Wholesale and arrived

14   just after 9 a.m.

15   **Q**    In what vehicle did they arrive?

16   **A**    The black Nissan Titan.

17   **Q**    And when we are saying they, who was they?

18   **A**    Mr. Duran and Mr. Flores.

19   **Q**    Did they select any firearms for purchase at BPW?

20   **A**    They did.

21   **Q**    What did they select?

22   **A**    Three Barrett 50 caliber rifles.

23   **Q**    Now, ostensibly, who was making this purchase?

24   **A**    Flores.  He indicated he wanted to pay with cash.

25   **Q**    So he would have been filling out this 4473?

1    **A**      That's correct.

2    **Q**      Did he require any assistance to do so?

3    **A**      Yes.  I believe Mr. Duran acted like an interpreter or

4    a translator and basically assisted Mr. Flores in the

5    completion of the form 4473.

6    **Q**      What did Mr. Flores mark for question 21(a)?

7    **A**      He marked yes, that he was the actual buyer, purchaser.

8    **Q**      What was the total purchase price for that attempted

9    transaction?

10   **A**      I don't know exactly, but it was just over $31,000.

11   **Q**      Did Mr. Flores say how he wanted to pay that?

12   **A**      He indicated he wanted to pay with cash.

13   **Q**      Did that transaction complete?

14   **A**      It did not.

15   **Q**      Why not?

16   **A**      ATF interdicted.  Not really interdicted, but we -- at

17   that point we didn't interdict.  The FFL just blanket said

18   hey, we are going to delay this, and they contacted the local

19   ATF office.

20   **Q**      So the transaction was delayed and the purchaser was

21   told that there would be a delay because of the background

22   check?

23   **A**      Correct.

24   **Q**      Did Mr. Flores make any purchase that day?

25   **A**      He did, actually, yes.

1  **Q**     What did he buy?

2  **A**     It was approximately 15 Barrett 50 caliber rifle

3  magazines.

4  **Q**     Do you know the total purchase price for that?

5  **A**     It was over $2,700, just under 3,000.  I think it was

6  2,700 and some change.  I don't know exactly.

7  **Q**     You said that he bought 15 magazines; is that correct?

8  **A**     Correct.

9  **Q**     How many did Birmingham Pistol Wholesale have in stock

10 that day?

11 **A**     The way the employee described it to me is every one

12 they could put their hands on.  So pretty much their available

13 stock.

14 **Q**     Did Mr. Flores pay with cash for this deal?

15 **A**     Yes, he did.

16 **Q**     Did ATF surveil Mr. Duran and Flores after they left

17 the store?

18 **A**     Yes.

19 **Q**     Where did they go?

20 **A**     They made a stop at a gas station, ultimately getting

21 on I-22, and headed towards Memphis.  They made a stop in

22 Memphis.  And then their continued travel indicated that they

23 were going back to Tulsa, Oklahoma, or Oklahoma in general.

24 **Q**     When Birmingham Pistol Wholesale delayed the

25 transaction, did they indicate to Mr. Duran and Flores how

1   long it would be before they might get to proceed?

2   **A**      From what I recall, it was until Saturday.  So that

3   gave the ATF Birmingham office a couple of days to really dive

4   into this and try to figure out what was going on.

5   **Q**      So what we've described here was on May 9th; is that

6   correct?

7   **A**      Yes.

8   **Q**      What happened on May 10th?

9   **A**      They arrived at the Tulsa, Oklahoma, FFL, the original

10  one, High End Armaments, in Tulsa, Oklahoma, and attempted to

11  purchase a Barrett 50 caliber rifle.

12  **Q**      And who was it?  Who was there?

13  **A**      Mr. Duran and Mr. Flores.

14  **Q**      In what sort of vehicle did they arrive?

15  **A**      They were in their mother's -- I forget the year, but

16  white Hyundai Tuscon.

17  **Q**      And you said their mother.  Do they share a mother?

18  **A**      Oh, I apologize.  No.  Mr. Duran's mother.

19  **Q**      So they were in Duran mother's car to go purchase this

20  rifle?

21  **A**      That's correct.

22  **Q**      Did the transaction complete?

23  **A**      It did not.

24  **Q**      Why not?

25  **A**      ATF interdicted.  The FFL received $12,000 or about

1  $12,000 for the purchase of one single Barrett 50 caliber

2  rifle, and then the FFL at the direction of ATF was told to

3  delay Mr. Flores for several days on that transaction to take

4  place.

5  **Q**    So they left the store without a gun; is that correct?

6  **A**    That's correct.

7  **Q**    But they did prepay for that gun?

8  **A**    In cash, yes.

9  **Q**    What happened after Mr. Duran and Flores left High End

10  Technology?

11  **A**    They received a call a short time later from Birmingham

12  Pistol Wholesale indicating that they had received a proceed

13  and basically that their rifle was in -- Flores' rifle was in

14  Birmingham available for pickup.

15  **Q**    Do you know what Mr. Flores and Duran did after that?

16  **A**    Drove to Birmingham, Alabama, or towards.  They

17  actually stopped in Jasper.

18  **Q**    Did they stop in Jasper for the night?

19  **A**    We can put them in Jasper at about 11 p.m. at night.

20  **Q**    So would they have gone to Birmingham Pistol Wholesale

21  the next day?

22  **A**    They did.

23  **Q**    About what time did they arrive?

24  **A**    About 9:20, if I recall.

25  **Q**    And in what vehicle were they traveling at this point?

1    **A**      2016 black Nissan Titan.

2    **Q**      So they had switched out vehicles; is that correct?

3    **A**      Yes, sir.

4    **Q**      So they arrived to BPW, Birmingham Pistol Wholesale.

5    What happened when they arrived?

6    **A**      ATF again interdicted.

7    **Q**      Tell me what you mean by that.

8    **A**      We stopped the transfer of the rifles.  Basically,

9    Mr. Duran parked directly in front of the doors to Birmingham

10   Pistol Wholesale.  Mr. Flores and Mr. Duran walked in, made

11   contact with a Birmingham Pistol Wholesale employee, and was

12   also met by an ATF undercover agent.

13   **Q**      The Birmingham Pistol Wholesale employee, did he have

14   Mr. Flores recertify the 4473?

15   **A**      Right.  But before that recertification takes place,

16   the employee reviewed the form and specifically question 21(a)

17   ensuring that Mr. Flores was the true buyer and purchaser of

18   those firearms, and that whole interaction was observed by the

19   ATF undercover agent, and that's when the conversation was

20   transferred, I guess is a good way to say it, to the ATF

21   undercover agent.

22   **Q**      In both the verbal portion and the recertification of

23   the 4473, did Mr. Flores indicate that he was the true

24   purchaser?

25   **A**      Yes.  I believe Mr. Duran actually translated for that

1    part, too, but then Mr. Flores recertified that all the

2    information that he provided on the form on the 9th was still

3    true and correct.

4    **Q**    Were both Mr. Duran and Flores separated at some point?

5    **A**    They were.  After Mr. Flores had recertified that the

6    information was true and correct, Mr. Flores was asked to step

7    into a back room to count the money, because it was a lot of

8    money, don't want to put $30,000 on the counter at Birmingham

9    Pistol Wholesale.  So he was asked to come around back, and

10   Mr. Duran was informed that he could pull around back so that

11   they could load the rifles into his black pickup truck.

12   **Q**    When they were separated, were they detained?

13   **A**    There's a little bit more going on between that, but

14   yes.

15   **Q**    Was Mr. Flores, the purported purchaser, was he

16   interviewed post-Miranda?

17   **A**    Mr. Flores, yes.

18   **Q**    What did he tell you about this?

19   **A**    That basically -- I'm just going to summarize it the

20   best I can.  That Duran had provided him the funds, that Duran

21   had already obtained six Barrett 50 caliber rifles, and that

22   Mr. Flores believed that Mr. Duran was associated with the

23   cartel.

24   **Q**    Let me make sure I understand correctly.  You said that

25   Mr. Flores said that the defendant had provided the funds for

1    this deal; is that correct?

2    **A**      That's correct.

3    **Q**      And that he was the actual purchaser in interest?

4    **A**      That's correct.

5    **Q**      When Mr. Duran was taken into custody, were any phones

6    or a phone recovered from him?

7    **A**      Mr. --

8    **Q**      Mr. Duran.

9    **A**      Mr. Duran, yes.  We got two phones from Mr. Duran.

10    **Q**      And in investigating those phones, the physical body of

11    those phones, was any evidence recovered from the physical

12    body of those phones?

13    **A**      Yes.  While we were getting information, identifying

14    information for the phone, like the physically identifying

15    information, like what color it is and what make and model,

16    maybe the IMEI, whatever, we were looking at those phones for

17    an application and we discovered a receipt folded up between

18    the phone and the phone case of Mr. Duran's phone.

19    **Q**      What was that receipt for?

20    **A**      Three Barrett 50 caliber rifles from a gun dealer in

21    Iowa.

22    **Q**      What was the approximate date of that purchase?

23    **A**      April, late April.  I want to say it was the 28th,

24    about the 28th, April 28th.

25    **Q**      So approximately two weeks before this?

1    **A**      Yes, sir.

2          MR. McBRAYER:  I don't have anything further for

3    this witness, Your Honor.

4          THE COURT:  Thank you.  Cross examination,

5    Ms. Bounds?

6                          **CROSS-EXAMINATION**

7    **BY MS. BOUNDS:**

8    **Q**      Good afternoon.

9    **A**      Good afternoon.

10   **Q**      Did the Birmingham Pistol Wholesale employee indicate

11   to you how he knew that Mr. Duran was the person on the phone

12   on December 1st of 2022?

13   **A**      It says -- the handwritten notes that I have seen in

14   that case, in that referral, gave his first and last name as

15   if he had given it to the FFL, a phone number from which he

16   had called on, which we have linked to Mr. Duran, and then

17   also there was a note that said hundred percent cartel.

18   **Q**      And so had that FFL ever talked to someone saying that

19   they were Mr. Duran before?

20   **A**      I don't know.

21   **Q**      Or sold firearms or dealt with anyone named Mr. Duran

22   before?

23   **A**      No, I don't know.

24   **Q**      Do you know what the basis for the statement "hundred

25   percent cartel" by a gun dealer on the phone would be?

1   A        I can only assume, if you would like me to, but it's

2   very -- it raises a lot of red flags when people of any type

3   nationality buy multiple Barrett 50 caliber rifles.

4   Q        So there's no other experience-based basis specific to

5   the firearms dealer's interactions with Mr. Duran that you

6   know of that would have supported that?

7   A        Can you repeat that question again?

8   Q        You're not aware of any other experienced-based basis

9   from interactions between that firearms dealer and Mr. Duran

10  that would have caused him to say a hundred percent cartel?

11  A        Prior to December 1st of 2022, I'm not aware of any

12  other contact that Mr. Duran made to the Birmingham Pistol

13  Wholesale at this time.

14  Q        In paragraph 24, you're describing a phone call that

15  happened I believe on May 10th, the one before the two men,

16  Mr. Flores and Mr. Duran, traveled to Birmingham?

17  A        I would have to see the report.

18           MS. BOUNDS:  May I approach, Your Honor?

19           THE COURT:  You may.

20  A        Yes, I'm familiar.

21  BY MS. BOUNDS:

22  Q        And you were present when that phone call was made?

23  A        I was.

24  Q        You wrote in here Flores and/or Duran advised they

25  would travel back to Alabama to pick up the firearms the next

1  day?

2  **A**      Correct.

3  **Q**      So you don't know which one of those was speaking to

4  the firearms dealer?

5  **A**      Me personally, I can't definitively say.

6  **Q**      Was it on speakerphone?

7  **A**      It was.

8  **Q**      Did the firearms dealer tell you that's the same voice

9  that I talked to in December?

10  **A**      No.

11  **Q**      So you didn't have the firearms dealer have the person

12  on the other end of the phone identify what their name was

13  during that call?

14  **A**      I don't recall.

15  **Q**      Did you have any indication from the firearms dealer

16  whether on the December 1 of '22 call there were two people

17  present on the other end of the phone?

18  **A**      Could you repeat the question?

19  **Q**      Did the firearms dealer, this Birmingham Pistol

20  Wholesale, indicate to you whether on December 1st of '22,

21  during that first phone call, whether it appeared that there

22  were two people on the other end of the phone standing

23  together while one person was making the call?

24  **A**      No, that indication was not made.  It was just Duran's

25  information.

1  Q      And in that phone call you were just testifying about

2  that you were there for that was on speakerphone on May 10th,

3  was there any indication that there was anyone standing with

4  the person that was on the other end of the phone, that there

5  might be two people together on the other end of the phone?

6  A      I don't recall.  I would have to refer to the

7  recording.

8  Q      So it was your belief that Mr. Flores had gotten the

9  Oklahoma license on May 8th?

10  A      Correct.

11  Q      So that he could be a straw purchaser for Mr. Duran; is

12  that right?

13  A      Correct.

14  Q      And you thought that that was the plan of action

15  because of the previous denial on May 5th?

16  A      I think it had a lot to do with it, but that's just a

17  lot to do with the modus operandi in general, just from my

18  experience.

19          MS. BOUNDS:  May I approach again, Your Honor?

20          THE COURT:  You may.

21  **BY MS. BOUNDS:**

22  Q      So was it the special agent's opinion that Mr. Flores

23  obtained the Oklahoma license because of the previous denial;

24  is that right?

25  A      As I previously indicated, yes.

1  **Q**      And Mr. Flores rather than Mr. Duran was the one who

2  presented the U.S. passport and got the denial on May 5th?

3  **A**      Repeat the question, please.

4  **Q**      Was Mr. Flores the one who presented the U.S. passport

5  and received the denial on May 5th?

6  **A**      I believe so.

7  **Q**      Does Mr. Duran have a state license?

8  **A**      I have seen a North Dakota license for Mr. Duran.

9  **Q**      And you said that you can only buy -- can you repeat

10 the testimony you gave earlier about you can only buy firearms

11 in your state of residence using a license that's from your

12 state of residence; is that right?

13 **A**      We would have to refer to the court reporter for what I

14 said.

15 **Q**      Is it, to your knowledge, the law that you can only

16 purchase a firearm in your state of residence if you have --

17 **A**      If you have what?

18 **Q**      Is it the law that you can only purchase a firearm in a

19 state where you're presenting a license from that same state

20 where the gun store is located?

21 **A**      As far as purchasing, no.  We're talking about FFL to

22 FFL transfer.  My previous testimony was dealing with gun

23 store to gun store transfers.  He would still have to do the

24 paperwork and/or purchase the firearm and complete the 4473 in

25 the state of Oklahoma, which is where the firearms were

1  requested to be transferred, although he only provided

2  information indicating that he was a North Dakota resident.

3  **Q**     So could someone purchase a firearm in Oklahoma in a

4  gun store using a North Dakota license?

5  **A**     Repeat your question, please.

6  **Q**     Could someone go into a gun store in Oklahoma and

7  present a North Dakota driver's license and purchase a

8  firearm?

9  **A**     I'm not familiar with the state laws.  But federally,

10  yes.  But if there were state laws that prohibited such

11  transactions, then the feds would use that for a denial as

12  well.

13         THE COURT:  I think the testimony you're getting at

14  had to do with him presenting a passport as opposed to a

15  state-issued identification card of some type.

16         Is there a federal law that requires an FFL to have

17  a state-issued license identifying a residence and a state of

18  residence rather than a passport that doesn't have that

19  information?

20         THE WITNESS:  That's correct.

21  **BY MS. BOUNDS:**

22  **Q**     Does Birmingham Pistol Wholesale have surveillance

23  cameras?

24  **A**     They do.

25  **Q**     Does High End Armament?

**A**     They do.

**Q**     Have you obtained the footage from those?

**A**     I have received a lot of video.  Whether I have received all, I don't know.  We're also getting the video from Iowa as well.

**Q**     And these interviews occurred after the arrest?  The interviews of the two suspects occurred at Birmingham Pistol Wholesale?

**A**     No.  There was some conversation at Birmingham Pistol Wholesale, some conversations in the car ride, some conversations in the interview rooms at the ATF office.

**Q**     The statements that Mr. Flores made about Mr. Duran and that he was a straw purchaser for Mr. Duran and that Mr. Duran worked for the cartel, were those statements made, if you recall, at Birmingham Pistol Wholesale or in the car or at the ATF?

**A**     I think it would be post-Miranda at the ATF office with an interpreter present.

**Q**     And that would have been recorded?

**A**     Yes, ma'am.

**Q**     Is there any reason you know of why Mr. Duran would not have been able to buy these guns himself?

**A**     Are you specifically talking about the three firearms at Birmingham Pistol Wholesale on May 9th and 11th?

**Q**     Yes.

1  **A**      I immediately don't know of any prohibiting reason why

2  Mr. Duran would have not been able to purchase or fill out the

3  4473 and proceed.  I can't really think of anything right now.

4  **Q**      And he has a concealed carry permit?

5  **A**      I do not know.

6          MS. BOUNDS:  That's all the questions I have, Your

7  Honor.

8          THE COURT:  Mr. McBrayer?

9          MR. McBRAYER:  Brief redirect, Your Honor.

10                     **REDIRECT EXAMINATION**

11  **BY MR. McBRAYER:**

12  **Q**      Agent Baker, Ms. Bounds was asking you for the basis of

13  the BPW employee's conclusion that Mr. Duran was a hundred

14  percent cartel.  Do you recall that testimony?

15  **A**      I do.

16  **Q**      Do you recall whether the BPW employee engaged in any

17  talk with Mr. Duran about Barretts generally?

18  **A**      Generally, yes.

19  **Q**      In that talk, did Mr. Duran appear knowledgeable about

20  Barretts?

21  **A**      From what I recall, he did not, because the employee

22  was trying to get specifics for the rifle, like barrel length,

23  color, finish.

24  **Q**      So it's like a car, there's options?

25  **A**      Yes, there's lots of options.  But yes, Mr. Duran

1    seemed to indicate -- or the employee indicated to me that

2    Mr. Duran wasn't very knowledgeable of the specifications

3    available for the Barrett 50 caliber rifle.

4    **Q**    He just knew he wanted to buy two of them?

5    **A**    Correct.

6    **Q**    In your experience and training, is the Barrett a

7    common rifle?

8    **A**    No, it is not.

9    **Q**    And why is that?

10   **A**    Mainly because it's so expensive not just to purchase

11   but to shoot.  The rounds can cost anywhere from 10 to 20

12   dollars a piece.  It's heavy.  It's awkward.  And you can't

13   hunt anything with it other than people and material.

14   **Q**    Let me turn your attention to the Iowa gun sale you

15   were talking about, the receipt that was found in the back of

16   Mr. Duran's phone.  Do you recall that testimony?

17   **A**    I do.

18   **Q**    And you testified a few minutes ago that video was

19   being obtained from that transaction; is that correct?

20   **A**    Yes.  From the April transaction, yes.

21   **Q**    Do you know if a vehicle associated with Mr. Duran was

22   seen at the gun store that day?

23   **A**    Yes.

24   **Q**    And when I say at the gun store, I'm talking about the

25   Iowa gun store?

1   **A**      Yes.

2   **Q**      Which vehicle was seen?

3   **A**      Duran's black 2016 Nissan Titan.

4   **Q**      Let me move you back to the Birmingham sale, we will

5   call it, or the Birmingham attempted transaction.  The

6   Birmingham transaction, was there a specific shirt that

7   Mr. Duran was wearing?

8   **A**      Yes.  On the 9th, yes.

9   **Q**      Can you tell the Court about that shirt?

10  **A**      It's a very unique shirt.  It depicts -- I would

11  describe it as like a retro Hawaiian shirt.  It has pictures

12  of little pistols and an octopus with multiple pistols in each

13  tentacle, white in color with blue designs.

14  **Q**      Did your agency conduct any investigation into that

15  shirt?

16  **A**      We did.  We were able to identify that that was a

17  promotional giveaway from the Iowa FFL and that Mr. Duran was

18  given that shirt at the April transaction, the same one that

19  we found the receipt for, basically a month ago.

20  **Q**      And so that was for another **Barrett** 50 caliber rifle?

21  **A**      Yes.  What was interesting is they were giving those

22  shirts away as a promotion for customers who spent more than

23  $2,000 in the store.

24  **Q**      When taking Mr. Duran into custody and the subsequent

25  investigation, did you find any firearms in his possession?

```
 1   A       I did.

 2   Q       What firearm was that and where was it located?

 3   A       A Ruger 5.7 -- I believe it was highly secured in the

 4   back passenger area of the vehicle.  I would have to refer to

 5   the report for the exact location.

 6   Q       In your investigation of this case, were you able to

 7   locate any border crossings associated with Mr. Duran?

 8   A       Several.

 9   Q       When was the latest one?

10   A       April of 2023.

11   Q       And from where was he traveling and to where?

12   A       From Mexico into the United States.

13           MR. McBRAYER:  I have nothing further, Your Honor.

14           THE COURT:  Ms. Bounds?

15                        RECROSS-EXAMINATION

16   BY MS. BOUNDS:

17   Q       The firearm that you found in Mr. Duran's truck, that

18   was legally possessed, right?

19   A       As far as state law?

20   Q       Anything.

21   A       I'm not aware of any -- it being -- contrary to any

22   laws, that I'm aware.

23           MS. BOUNDS:  That's the only question.  Thank you.

24           THE COURT:  Anything further, Mr. McBrayer?

25           MR. McBRAYER:  No, Your Honor.  Thank you.
```

1    THE COURT:  Agent Baker, I have a couple of

2    questions.  Do you know if the form 4473 was completed with

3    respect to the firearms transaction that occurred in Iowa

4    related to the receipt that was found with the defendant's

5    phone?

6    THE WITNESS:  I found the receipt in Mr. Duran's

7    phone.  It was for a transaction for three Barrett rifles in a

8    nominee name, not Duran, for that April purchase of three

9    Barrett rifles.

10    THE COURT:  Was a 4473 form completed for that?

11    THE WITNESS:  Yes, ma'am.  We were actually

12    receiving those reports about 30 minutes before.  I haven't

13    had a chance to review them.  I've only got agent's verbal...

14    THE COURT:  I assume if you had that information, it

15    would be fairly fresh, so I wasn't expecting a lot of details,

16    but was the nominee purchaser Flores or someone else, or do

17    you even know yet?

18    MR. McBRAYER:  Could we approach, Your Honor?

19    THE COURT:  You may.

20    (Discussion off the record.)

21    THE COURT:  All right.  Those are all of my

22    questions.  Anything further from counsel?

23    MR. McBRAYER:  No, Your Honor.  No further evidence.

24    MS. BOUNDS:  No, Your Honor.

25    THE COURT:  Thank you, Agent Baker.  You may step

1    down.

2            MR. McBRAYER:  And, Your Honor, we would proffer the

3    pretrial services report.

4            THE COURT:  Ms. Bounds?

5            MS. BOUNDS:  Yes, Your Honor.  We are asking that

6    Mr. Duran be allowed out on bond.  Would Your Honor prefer

7    that we argue about the preliminary hearing first or

8    address --

9            THE COURT:  You can go ahead and address both

10   issues.

11           MS. BOUNDS:  Thank you.  Regarding the preliminary

12   hearing and probable cause, Agent Baker testified that

13   Mr. Duran could have purchased these firearms legally himself

14   if he wanted to, and I would submit that there's -- he doesn't

15   need a straw purchaser in order to purchase firearms, and that

16   he legally possessed the firearm that he had, and he could

17   have bought these guns himself if he wanted to, and that

18   there's no probable cause to believe that Mr. Flores was not

19   the one purchasing the firearms for himself, other than his

20   uncorroborated statement, Your Honor.

21           THE COURT:  The point that you are making does raise

22   another question for me, so you can remain where you are,

23   Agent Baker, but I do have one or possibly more questions for

24   you.

25           Assuming that Mr. Duran had, in fact, attempted to

1   purchase the Barrett rifles at either the Alabama FFL or the

2   Oklahoma FFL or the Iowa FFL and completed the form 4473 and

3   the FFL then conducted -- or had the FBI conduct the required

4   background check, if he had later attempted to do another

5   purchase in his name and gone through that same process with

6   an FFL, would that background check by FBI trigger in some way

7   prior purchases and would that information be conveyed to an

8   FFL in that event?

9          THE WITNESS:  To be as frank as I can, I'm not the

10  FBI branch.  I have no idea what they would have come back on

11  their background check.  I haven't personally seen anything

12  indicating that he would have just outright failed that, but,

13  again, I don't do those background checks.

14         It's also, I think, important to know and I want to

15  make sure that you understand that these are nominee names, in

16  an attempt to thwart law enforcement, and that's how they do

17  it.  They use straw purchases so they can continue this

18  illegal behavior.

19         THE COURT:  I completely understand that, and I'm

20  trying to get to the point that Ms. Bounds is making.  If

21  Mr. Duran had tried any of those purchases himself and an FBI

22  background check had been run, as the FFL is required to

23  request, does the FBI keep track of how many firearms are

24  being purchased by any one individual, whether it's Mr. Duran

25  or somebody else, so that if a 4473 form is filled out by

1   Mr. Duran or anybody else, one month and again the next month

2   and again the next month and the FBI check is being run, FBI

3   can say, oh, this same person attempted to purchase or did

4   purchase three Barrett rifles last month and the month before

5   and the month before, so that red flags are raised for the FBI

6   during that background check; or do you know that information?

7        THE WITNESS:  I know a lot about it.  There are

8   triggering aspects of a purchase.  For instance, the multiple

9   sale of handguns would trigger.  There's an ATF demand letter

10  three that requires border states to do multiple sales reports

11  on not just handguns but rifles, to combat illegal smuggling

12  and trafficking of firearms into Mexico to support the cartels

13  that are tearing the country apart.

14        The FFL also has the option to do a multiple sale if

15  they -- we are not going to tell them they can't do one, but

16  if they, although not required, want to go above and beyond

17  and report that as a multiple sale, they can.

18        However, single sale of handguns in one week,

19  multitude of rifles, if you're not on the border state, does

20  not trigger any kind of report or extra flagging, and I know

21  that the FBI per Congress is required to purge those records

22  of those firearms transactions.  So they can't even keep those

23  records, and they don't provide them to us.

24        The only thing we can do is say hey, FBI, we would

25  like to know on the front end, give us that information on the

front end; we have identified a suspicious purchaser or a

suspected trafficker; can we flag, so that when an FFL calls

in and says we want to do a background check on this person

for the purchase of firearms, the FBI would then send the ATF

a flag.

But if we don't do that on the front end or like in

this case where it develops in two days, we don't -- we

started this case with an interdiction, basically.

THE COURT:  How frequently does the FBI purge those

records?

THE WITNESS:  I know there's 90 days.  I don't know

what would -- I know it's 90 days, period.  Like, they can't

hold it more than 90 days.  But there's some other factors

that I'm not familiar with that would cause that purge sooner.

THE COURT:  All right.  Thank you.  Ms. Bounds?

MS. BOUNDS:  That concludes my argument regarding

probable cause, Your Honor.

As to bond, we would ask that Mr. Duran be allowed

to return to North Dakota and be on electronic monitoring and

location monitoring, home detention or curfew, and drug

testing.  He has lived in North Dakota for the last eight

years in Watson City.  He has lived at the same apartment for

four years and worked for Morgan Pipeline for the last year

and a half.  We would ask the Court to allow him to be

released on bond while the case is pending to be supervised in

1    North Dakota by the probation office.

2           THE COURT:  Thank you, Ms. Bounds.  I find there's

3    probable cause to support the criminal complaint charging

4    Mr. Duran with violating Title 18 United States Code, Section

5    371.

6           I also find there are no conditions of release which

7    would reasonably assure that the defendant would not pose a

8    danger to himself or others if released on bond, and I'm going

9    to order that he remain in custody, and will enter a written

10   detention order in due course.

11          Mr. McBrayer, anything further on behalf of the

12   government?

13          MR. McBRAYER:  No.  Thank you, Your Honor.

14          THE COURT:  Ms. Bounds, anything further on behalf

15   of Mr. Duran?

16          MS. BOUNDS:  No, Your Honor.

17          THE COURT:  Mr. Duran you are remanded to the U.S.

18   marshal.  This proceeding is adjourned.

19          (End of proceedings.)

20

21

22

23

24

25

C E R T I F I C A T I O N

        I hereby certify that the foregoing transcript
in the above-styled cause is true and accurate.


                    Leah S. Turner, RMR, CRR
                Federal Official Court Reporter